Charlene NGUON, et al, Plaintiffs,

v.

Ben WOLF, et al, Defendants.

No. SACV 05–868 JVS(MLGx).

United States District Court,
C.D. California.

Sept. 25, 2007.

Anne K. Richardson, Dan Stormer, Hadsell and Stormer, Pasadena, CA, Christine P. Sun, Hector O. Villagra, ACLU of Southern California, Los Angeles, CA, Christopher E. Campbell, Collie F. James, IV, Latham & Watkins, Costa Mesa, CA, James D. Esseks, ACLU Foundation, New York, NY, for Plaintiffs.

Dennis J. Walsh, Walsh and Associates, Stephan Birgel, Dennis J. Walsh Law Offices, Encino, CA, for Defendants.

## MEMORANDUM OF DECISION

JAMES V. SELNA, United States District Judge.

This matter came on for trial to the Court on November 28–30, and December 1, 5–7, and 12, 2006. Plaintiffs Charlene Nguon ("Charlene"),[1] by and through her next friend, Crystal Chhun ("Chhun"), and the Gay–Straight Alliance Network ("GSA Network") (collectively "Plaintiffs") were represented by Dan Stormer, Esq., Christine P. Sun, Esq., Collie F. James, Esq., Shawn E. McDonald, Esq., Jordan B. Kushner, Esq., and Anne Richardson, Esq. Defendants Ben Wolf ("Wolf"), Laura Schwalm ("Schwalm"), Kent Baird ("Baird"), Gary Lewis ("Lewis") (collectively "School Defendants") were represented by Dennis J. Walsh, Esq. and Stephan Birgel, Esq.

The focus of this case is Charlene and her relationship with Trang Nguyen ("Trang") during the academic year 2004–05 at Santiago High School ("Santiago"), part of the Garden Grove Unified School District ("District"). As discussed below in detail, Charlene was disciplined for her conduct with Trang, and Plaintiffs claim that Charlene's Constitutional, statutory, and common-law rights were violated in the process. Specifically, Plaintiffs assert causes of action against the School Defendants under the federal civil rights statute[2] for violation of Charlene's right to equal protection[3] and violation of her First Amendment right to freedom of expression.[4] Plaintiffs also assert that Wolf vio-

lated Charlene's right to privacy under California law by making certain disclosures to Charlene's mother, Chhun.[5] Plaintiffs also seek injunction and declaratory relief on these claims as well as a separate federal civil rights claim that the School Defendants violated her federal Constitutional right to privacy.[6]

In accordance with the Court's usual practice in bench trials, direct testimony was presented by way of declaration, and the witnesses were then submitted for cross-examination and further examination.

### I. Background.

#### A. The Plaintiffs.

*Charlene* At the beginning of the academic year 2004–5, Charlene was a 16 year-old junior at Santiago. Her first two years at Santiago were an academic success, and her grades remained high during the first semester of her junior year. (Ngoun Decl. ["Charlene"], ¶ 14 & Ex. A.) She took a number of Advanced Placement ("AP") courses, and was on a college track. (*Id.*, Ex, A.)

She was the youngest of five children of Cambodian immigrants. (Charlene, ¶ 3; Chhun Decl. ["Chhun"], ¶¶ 3–4.) Neither parent spoke or understood English well. (Charlene, ¶ 6.)

Charlene met Trang in a freshman Life Science class. (*Id.*, ¶ 15.) By the end of her sophomore year, Charlene realized

---

1. At trial, the student witnesses, including the individual plaintiff, were more comfortable being addressed by their first names. Accordingly, the Court refers to them in that fashion in this decision.

2. 42 U.S.C. § 1983.

3. First Claim for Relief.

4. Second Claim for Relief.

5. Sixth Claim for Relief.

6. Third, Ninth Claims for Relief. With regard to monetary damages, the Third Claim for Relief was dismissed as to the School Defendants on the basis of qualified immunity. (*See* Minute Order, Nov. 1, 2006 ["MSJ Order"], p. 15.)

that she "was attracted to her as more than a friend." (*Id.*, ¶ 16.) At the beginning of the 2004–05 academic year, Charlene asked Trang to be her girlfriend, and by November they felt sufficiently comfortable to begin expressing their affection by holding hands and hugging. (*Id.*, ¶¶ 17–18; T. Nguyen Decl. ["Trang"], ¶ 10.) By December, Charlene and Trang were kissing on the school grounds. (Charlene, ¶ 25.) Prior to the events which unfold below, Charlene had not revealed her sexual orientation to her parents. (*Id.*, ¶ 26.)

Charlene graduated from Santiago in June 2006, and now attends Orange Coast College. (*Id.*, ¶ 39.) The decline in her grades during her senior year led the University of California at Santa Barbara to withdraw an offer of admission. (*Id.*, ¶ 38 & Ex. B.)

*GSA Network.* The GSA Network is a youth-led non-profit organization made up of lesbian, gay, bisexual, and transgender ("LGBT") and heterosexual students and adults. (Laub Decl., ¶ 2.) Its mission is to eliminate harassment, discrimination, and intolerance toward LGBT students. (*Id.*) The GSA Network has been active in lobbying for legislation to protect LGBT students in California schools. (*Id.*, ¶ 13–14.) Beginning with academic year 2005–06, the GSA Network has had a chapter at Santiago. (*See id.*, ¶ 15.)

The GSA Network's standing in this case is based on the protection of the interests of its members.[7]

### B. *The School Defendants.*

*Principal Wolf.* Wolf was the principal at Santiago from July 2002 through June 2006. (Wolf Decl. ["Wolf"], ¶ 2.) As dis-

cussed below, he was the decision maker in determining what punishment to impose on Charlene for her conduct.

*Laura Schwalm.* Schwalm has been the superintendent of the District since 1999. (Schwalm Decl. ["Schwalm"], ¶ 3.)

*Kent Baird.* Baird was an assistant superintendent of the District from July 1, 2005 through June 30, 2006. (Baird Decl. ["Baird"], ¶ 1.)

*Gary Lewis.* Since 2003, Lewis has been assistant superintendent of the District for special education and student services. (Lewis Decl. ["Lewis"], ¶ 4.)

### C. *Santiago and the District.*

Santiago is a four-year high school. In 2004–05, Santiago had about 2,000 students. (Wolf, ¶ 6; Schwalm, ¶ 7.) The senior administrators consisted of Wolf, the principal, and several assistant principals, including Gay Stoval ("Stoval") and Ryan Smith ("Smith"). (Wolf, ¶ 6; Stoval Decl. ["Stoval"], ¶ 3; Smith Decl. ["Smith"], ¶ 1.)

The District has about 50,000 students. (Schwalm, ¶ 7.) The senior administrators in 2004–05 included the superintendent, Schwalm, and four assistant superintendents, including Baird and Lewis. (*Id.*, ¶ 4; Baird, ¶ 1; Lewis, ¶ 4.) Santiago is one of the high schools in the District.

### II. *Schwalm, Baird, and Lewis.*

As the evidence developed at trial, it became evident that Schwalm, Baird, and Lewis played no role in the disciplining of Charlene and Trang. (Schwalm, ¶ 15; Baird, ¶¶ 8–9; Lewis; ¶ 8.) Those decisions were made by Wolf between November 2004 and April 2005, and without consultation with District officials. (Wolf, ¶¶ 45;

---

7. On summary judgment, the Court dismissed the GSA Network's direct claims. (MSJ Order, pp. 3–4.)

PM 11–30.[8]) The three district administrators did not become aware of Charlene's complaints until receipt of a letter from her counsel in July 2005, well after the close of the 2004–05 academic year. (Schwalm, ¶ 14; Baird, ¶ 8 & Ex. A; Lewis; ¶ 6 & Ex. A.)

The Court has already granted summary judgment on Charlene's theories that the District lacked policies and procedures with regard to discrimination on the basis of gender and that the District administrators failed to investigate her claim of gender discrimination and take appropriate action. (MSJ Order, pp. 9–10.) There is simply no evidence to support a finding that Schwalm, Baird, or Lewis engaged in any "culpable action or inaction in the training, supervision, or control of [their] subordinates, . . . acquiescence in the constitutional deprivations of which the complaint is made, or . . . conduct that showed a reckless or callous indifference to the rights of others." *Larez v. City of Los Angeles,* 946 F.2d 630, 646 (9th Cir.1991) (citations, brackets, and internal quotation marks omitted.) For like reason, they did not violate Charlene's privacy rights under California law.

Schwalm, Baird, and Lewis are entitled to judgment in their favor on all claims for relief.

III. *Violation of Equal Protection Rights.*

Charlene claims that her right to equal protection under the laws was violated because discipline was imposed on her in a discriminatory manner based on her sexual orientation.

A. *The Applicable Law.*

█ Because the claim of discrimination rest heavily on the facts and the legal principles are not in dispute, the Court gives only brief attention to the applicable law. The following are bedrock: (1) sexual orientation represents a protected class for equal protection purposes, *Flores v. Morgan Hill Unified School District,* 324 F.3d 1130, 1137–38 (9th Cir.2003); *see Nabozny v. Podlesny,* 92 F.3d 446, 453–55 (7th Cir.1996); and (2) school officials are prohibited from intentionally treating students disparately on the basis of their protected status, here their sexual orientation. *Reese v. Jefferson School District No. 14J,* 208 F.3d 736, 740 (9th Cir.2000).

B. *The Evidence at Trial.*

█ The evidence at trial established that at Santiago it was the role of campus supervisors, assistant principals, and the principal to monitor and discipline students for engaging in inappropriate public displays of affection ("IPDA"). A student was typically first given a warning, and perhaps multiple warnings, before discipline was imposed. (Wolf, ¶ 9; Smith, ¶ 7; Sharabi Decl. ["Sharabi"], ¶ 7.) A warning had the effect of communicating precisely what conduct school administrators regarded as IPDA. (Wolf, ¶ 9.) Discipline was progressive: Saturday school, suspension, and transfer from the school. (Smith, ¶ 7.) The issue is whether this framework was implemented in an even-handed manner.

1. *What Constitutes IPDA.*

Although there were no written rules with regard to IPDA in 2004–05, Wolf outlined IPDA for the student body at an assembly at the beginning of the 2004–05

8. No transcript has been prepared. To assist the reader when one is, the Court refers to the morning or afternoon session and the date the testimony was given (*e.g.,* AM 11–30, morning session November 30, 2006).

school year. Assistant Principal Stoval testified that it was up to campus monitors and other school employees to make a judgment as to what constituted excessive kissing or hugging. (AM 11–29.) Stoval stated that her standard for IPDA was excessive conduct which someone would find unreasonable in a school setting. (AM 11–29.) While she testified that a student might not know that he or she crossed the line until warned by a school official, she also testified that she expected students to have a notion of what was proper and improper conduct on school grounds. In her 36 years with the District, this case was the first instance in which a student questioned what constituted IPDA. (AM 11–29.)

The evidence established a fairly common understanding of IPDA. Charlene agreed at trial that "as far as common sense was concerned, the only appropriate or acceptable form of public displays of affection were holding hands, kissing and hugging." (AM 12–5.) She had an understanding of the limits of acceptable PDA. (AM 12–5.) Trang testified that she had a "general understanding about what was appropriate or inappropriate display of affection" during her junior year. (AM 12–5.) Assistant Principal Stoval noted that in her sessions with Charlene and Trang, neither questioned what IPDA was. (AM 11–19.)

Virtually every student witness had an understanding of IPDA. Caitlin Hyunh ("Caitlin"), who attended Santiago during the same years as Charlene, described IPDA to include making out, kissing in excess of 30 seconds,[9] students laying on top of one another, biting lips, and groping. (PM 11–28.) Hang Nguyen ("Hang") testified that she had a concept of IPDA which included making out in excess of thirty seconds, laying on one another, and

standing between one another's legs, groping, and putting hands under the shirt of a partner. (AM 11–29; H. Nguyen Decl. ["H. Nguyen"], ¶ 6.) Hang also testified that one would know IPDA if a school official told a student to stop engaging in a particular form of conduct. (AM 11 –29.) Kristi Ngo's understanding of IPDA was similar to Hang's. (PM 12–6.) Although Sandy Insixiengmay ("Sandy") professed to be "confused" as to what constituted IPDA in her testimony, she was impeached with her lengthy list of conduct constituting IPDA which she recited at her deposition. (PM 11–29.) Diana Vo ("Diana") testified that she knew what IPDA was. (PM 11–28.) Her brother William Vo ("William") testified that Wolf's description of IPDA at year-opening student body meeting came as no surprise to him. (AM 11–28.)

The common understanding of IPDA at Santiago was neither so vague as to form a basis for imposing discipline nor so amorphous that the standard was open to abuse when applied by school administrators. See *Jauregui v. City of Glendale*, 852 F.2d 1128, 1136 (9th Cir.1998); *see also Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1136–37 (9th Cir.2003). This is particularly so because warnings always preceded discipline.

### 2. Charlene's Conduct.

By Charlene's own description, she began showing signs of affection for Trang by November 2004 by holding hands and hugging. (Charlene, ¶¶ 17–18; Trang Decl., ¶ 10.). However, their displays of affection quickly advanced beyond this stage. At trial, Charlene acknowledged that she had been warned three times before the first instance of discipline. (AM 12–4.)

**9.** In her deposition, she included kissing in excess of five seconds.

*December 2004.* Some time in December 2004, after a school day, an attendance secretary told Wolf that a parent had complained that two students were engaging in IPDA, making out, in front of her younger children. (Wolf, ¶¶ 11, 12; Gonzalez Decl. ["Gonzalez"], ¶ 8(a).) Wolf looked out a window and saw Charlene and Trang in front of the school "engaged in a long French kiss [with] their arms around each other."[10] (Wolf, ¶ 11.) Wolf could see that "their mouths were together for a long time and their faces were moving." (*Id.*)

Wolf left his office and approached Charlene and Trang. Wolf told them that he had received a complaint, that their conduct was not appropriate, and that they were not to repeat the conduct. (*Id.*) This was the first warning which Wolf gave.

*Second Incident.* Subsequently, Wolf was advised of another incident after a school day by campus supervisor Dorothy McCuiston ("McCuiston"). (*Id.*, ¶ 13.) Two couples—Charlene and Trang and a boy and a girl—were engaging in IPDA. (*Id.*) McCuiston told Wolf that she had previously advised both couples that their conduct was inappropriate. (*Id.*; McCuiston Decl. [McCuiston], ¶ 13.) Wolf left his office to observe, and realized that one of the couples was Charlene and Trang. Wolf saw the couple engaging in "long, intense kissing." (Wolf, ¶ 13.) He directed McCuiston to bring the couples to his office.

Wolf told both couples that their conduct was inappropriate and imposed Saturday school. (*Id.*) The Saturday school administrative form for Charlene noted "heavy kissing w/other girls." (*Id.*, Ex. A; Trial Exhibit ("TX") 1.) Wolf contended that the form was prepared by a school secretary, and that he did not know where the state-ment "heavy kissing w/other girls" came from. (*Id.*, ¶ 15.) Assistant Principal Stoval stated that she wrote the information on the form, and that the form was placed in the student's disciplinary file and not available to parents or other students. (Stoval, ¶ 8; Wolf, ¶ 16.)

Given McCuiston's prior warning, Wolf regarded this as the third time Charlene and Trang had engaged in IPDA. (Wolf, ¶ 13.)

*Third Incident.* The third instance of IPDA was not directly observed by Wolf, but reported by McCuiston. (*Id.*, ¶ 18.) Wolf was informed that Charlene and Trang were "making out-involved in heavy kissing." (*Id.*) Wolf met with Charlene and Trang and imposed a one-day suspension. (*Id.*, ¶ 19 and Ex. B.) The precise basis for the suspension was defiance of previous orders not to engage in IPDA, not the IPDA itself. (*Id.*, Ex. B ("willfully [sic] defied the valid authority of school personnel"); TX 106.)

*Fourth Incident—2005.* In early 2005, Marcia Sharabi ("Sharabi") reported to Wolf after-the-fact that Charlene and Trang had been making out. (*Id.*, ¶ 24.) Because of the belated report and the fact that he was busy, Wolf took no action. (*Id.*)

*Fifth Incident—2005.* As he was on his way to a meeting, Wolf observed Charlene and Trang engaging in "lengthy kissing . . . with one of the girls . . . legs wrapped around the other girl." (*Id.*, ¶ 25.) "One of the girls had her hand under the shirt of the other girl." (*Id.*) Wolf told them to stop, watched long enough to ensure that they did, and proceeded to his meeting. He did not discipline Charlene and Trang. (*Id.*)

*Sixth Incident—2005.* Either Stoval or Sharabi reported to Wolf another incident

---

**10.** The school secretary also observed the conduct. (Gonzalez, ¶ 8(a).)

of "heavy kissing and touching each other." (*Id.*, ¶ 27.) At that point, Wolf imposed a second suspension for three days. (*Id.*, ¶ 27 & Ex. B.) Again, the stated reason for the suspension was defiance. (*Id.*, Ex. B.) The suspension ran from March 22 to March 25, 2005.

During the second suspension, Wolf met with Charlene's mother. He raised the possibility of a fresh start at another school, and Charlene's mother agreed.[11] (*Id.*, ¶ 37.) Wolf then made arrangements with the principal Denise Jay ("Jay") at Bolsa Grande, another school in the District, for the transfer. (Wolf, ¶ 41 & Ex. D.) In the e-mail to Jay, concerning the principal-to-principal transfer, Wolf wrote "What do I do with the 2 girls if they keep making out?" (*Id.*, Ex. D, TX 33.) Jay's advice was to "keep doing what you would do with boy-girl couples making out." (*Id.*)

*Other Incidents.* There were a number of other instances of IPDA observed by other Santiago staff members, but not reported to Wolf, and thus apparently not part of his knowledge in making disciplinary decisions. The Court recites this evidence as tending to show that the incidents observed or reported to Wolf in fact occurred, as part of a pattern, and as indicative of the fact that the incidents observed by or reported to Wolf were not isolated.

At a time not stated but during the 2004–05 academic year, business teacher Barbara Roberts observed two instances of IPDA. (Roberts Decl. ["Roberts"], ¶ 4.) On one occasion, she saw Charlene and Trang standing near the administration building, with their hands around each other and one girl's hand under the other girl's blouse: It appeared to Roberts that "her hand was in the area of the other's breast." (*Id.*, ¶ 5.) On another occasion, the two were on a bench, either side by side or one on top of the other: They were "mauling each other and French kissing ... engaging in deep passionate kisses with their mouths, exchanging tongue and moving their heads side to side."[12] (*Id.*, ¶ 6.) Roberts told them that it was "no way to behave on campus," and they stopped. (*Id.*, ¶ 7.)

Some time in early 2005 school secretary Virginia Gonzalez observed Trang leaning against a railing near the school parking lot with Charlene standing between Trang's legs: Trang's pelvis was pressed against Charlene's buttocks. (Gonzalez, ¶ 8(b).)

On an afternoon in April 2005, the Santiago librarian observed Charlene and Trang in the library, "[o]ne girl ... sucking on the other girl's lip." (Stafford Decl., ¶ 5.) She told them the conduct was inappropriate. (*Id.*, ¶ 6.)

Charlene's and Trang's accounts of their on-campus expression of affection are not as extensive and outlined above. Charlene limits the number of times she French kissed with Trang to 1 to 5 occasions and the number of times they made out (kissed for more than five seconds) to 1 to 3 times. She acknowledged that there was at least one instance in which Trang had her hand under Charlene's shirt—although there is a dispute as to where Trang's hand was and whether it was just a game. By

11. In Wolf's conversation with Charlene and Trang regarding the second suspension, Charlene stated that she would leave Santiago if the two had to be separated. (Wolf, ¶ 28.) Wolf contends that he did not tell the girls that one of them would have to leave Santiago. (*Id.*)

12. It appears that this incident was reported to Assistant Principal Smith, and he observed he conduct. (Smith, ¶ 13(d).) Smith also observed another incident that was reported to Wolf. (*Id.*, ¶ 13(c).)

Trang's estimate, they made out 5 to 10 times on campus during their junior year. (AM 12–5.) However, the Court has no doubt that Charlene and Trang engaged in extensive IPDA. As Charlene testified at trial, Charlene and Trang were open in their relationship, and did not attempt to conceal their public displays of affection, whether appropriate or not. The record is replete with warnings and continued disregard for those warnings. Unquestionably, Charlene's conduct was defiant. However, for present purposes, the issue is not whether the actions of Charlene and Trang warranted discipline for engaging in IPDA, but whether they were treated equally.[13]

3. *Conduct of Heterosexual Couples.*

There is ample evidence that heterosexuals engaged in making out and other forms of IPDA at Santiago during the year 2004–05.

Photos taken by student William show a couple making out adjacent to the door to the principal's office. (TX 32.) William testified that he observed the same couple making out on other occasions. (AM 11–28.) He further testified that couples made out at the same place four out of five days. (AM 11–28.) Another photo taken by William shows a couple making out in an area of open lawn about sixty yards from the principal's office. (TX 30.) William testified that other couples regularly engaged in IPDA in the same area, including making out, hugging, and lying on the lawn. (AM 11–28.) However, he also testified that he never saw the monitors, McCuiston and Sharabi, ignore IPDA. (AM 11–28.)

While Plaintiffs' trial witnesses were challenged as to whether school officials

observed the conduct to which they testified, no witness was challenged as to whether the IPDA they observed and testified about actually occurred. The tactical decision not to challenge the factual accuracy of this testimony is telling. Instances of improper IPDA among heterosexual couples occurred and occurred regularly.

With minor exceptions, Plaintiffs' witnesses could not testify to overt neglect on the part of school officials to discipline inappropriate behavior. Charlene could not cite a specific instance in which students were involved in displays of affection beyond hugging, a peck on the cheek or lips, holding hands, o r sitting in one another's laps that was ignored by the monitors, Sharabi or McCuiston, or the school secretary Gonzalez. (AM 12–5.) She could testify to no instances where Wolf or the assistant principals ignored IPDA. (AM 12–1.) Similarly, Trang could cite not instance in which Wolf ignored IPDA. (AM 12–5.)

William could not cite an instance in which the school monitors who had a significant role in controlling IPDA, McCuiston and Sharabi, ever ignored IPDA. (AM 11–28.) Similarly, he could not state that Wolf or any other school administrator saw the instances of IPDA recorded in his trial declaration. (AM 11–28.) William could not state that any of the heterosexual conduct which he captured in his photos (Exs. 29–32) was observed by Principal Wolf or any other school official. On cross examination he could not state that the person labeled as Staff in Exhibit 29 was in fact a member of the school staff, and

---

**13.** Carolyn Laub, executive director of the GSA Network, testified, that the GSA Network did not approve of IPDA for same-sex or heterosexual couples, but rather the GSA sought to ensure that all were treated similarly regardless of apparent sexual orientation. (AM 11–28.)

did not even know his name.[14]

Caitlin similarly testified that she had never seen school officials observing IPDA or ignoring it. (PM 11–28.) Hang testified that no school employees had seen or ignored the instances of IPDA which she had seen, nor could she say that in general school officials ignored IPDA. (AM 11–29.) Other students, including Diana, testified similarly that they had not seen school officials ignore IPDA. (PM 11–28.)

Sandy testified that she never saw the two monitors, McCuiston and Sharabi, ignore IPDA. Sandy's statement in her declaration that "officials would do nothing [about IPDA]" (Insixiengmay Decl. ["Sandy"], ¶ 10.) was impeached by her deposition testimony to the contrary. (PM 11–29.) In her deposition testimony, she also indicated that she had never related to Charlene's counsel any instance in which a school official ignored IPDA.

The testimony that school officials ignored IPDA was limited. Trang testified that she had seen McCuiston and Sharabi ignore IPDA, but she was impeached by her deposition testimony. (AM 12–5.) Trang also testified that teachers generally ignored such conduct, but as noted above, teachers were not generally charged with discipline. Caitlin testified to three instances in which she saw a school official ignore IPDA between heterosexual couples. (PM 11–28.) She testified that McCuiston walked by people engaging in IPDA as she walked from the entrance gate which she monitored. (PM 11–28.)

Hang and others testified that school officials frequented or patrolled various areas on the campus, and that IPDA occurred in the those locations. (AM 11–29.) However, no link was made between the occurrence of IPDA and actual observation by school employees. (AM 11–29; see testimony re TX 206, 207, 212.) She affirmatively testified that she never saw school employees ignore IPDA. (AM 11–29.) Similar unlinked testimony was given by Diana (PM 11–28), Sandy (PM 11–29), and Kristi Ngo (PM 11–30). Part of the difficulty in establishing that school officials ignored IPDA is the fact that students tended to avoid such conduct when those officials were around. (AM 11–29 (Stoval).) And some places where students made out were secretive, or students would try not to be seen. (AM 11–29 (Hang); PM 11–29 (Sandy).)

The Court necessarily has had to evaluate the testimony of the student witnesses. Most were friends of Charlene and Trang. Some participated in the publicity that surrounded the suit once it was filed. William in particular seemed to be caught up with the attention which MTV and Teen People Magazine paid to the case. While the Court believes that heterosexuals engaged in IPDA, the Court finds that such conduct was not as extensive as painted by the students, and was not consistently ignored by the School Defendants.

Plaintiffs' claim that there is statistical evidence of discrimination lacks probative force. See Plaintiffs' Proposed Findings of Fact and Conclusions of Law, Conclusion 8 at p. 15. The record reveals that discipline for IPDA was not a regular occurrence, and that most students behaved properly and certainly did once warned. (Smith, ¶ 13; AM 12–7 (McCuiston); PM 11–29 (Sharabi); AM 12–1 (Merito).) The number of disciplinary incidents—of both gay and straight students—is so small compared to the overall population of gay and

---

14. William did testify that it was unusual for adults to be on campus other than school officials and employees to be on campus. Thus, one could infer a likelihood that the person was a school employee.

straight students that the relative incidence of discipline is meaningless.

The Court finds that the School Defendants neither disciplined on a discriminatory basis nor did they engage in deliberate indifference with regard to IPDA engaged in by heterosexual couples. When Charlene and Trang were initially disciplined with Saturday school, a heterosexual couple also received the same discipline. (Wolf, ¶ 34.)

### C. *Mixed Motivation.*

In post-trial briefing, Plaintiffs assert that it is sufficient to demonstrate that Charlene's sexual orientation was a motivating factor for the disciplinary actions which Wolf took. (Plaintiffs' Brief re: Mixed Motivation Discrimination, pp. 2–3.) There are procedural and factual impediments to this argument.

First, Plaintiffs concede that this theory was not presented until after the close of evidence. There is no mention of a mixed motivation theory in the Amended Pretrial Conference Order. (Amended Pretrial Conference Order, pp. 4–5.) Nor do Plaintiffs offer any valid basis for avoiding the preclusive effect of the statement of issues in a pretrial conference order. Fed. R. Civ. Pro. 16(e). Plaintiffs cite *Dominguez–Curry v. Nevada Transportation Department*, 424 F.3d 1027, 1042 (9th Cir. 2005), for the proposition that they can wait to the close of evidence. While it is true that a plaintiff need not decide his or her theory at the outset, *Stegall v. Citadel Broadcasting Co.*, 350 F.3d 1061, 1071 (9th Cir.2003), nothing in *Dominguez–Curry* or *Stegall* purports to abrogate Rule 16. In overturning the grant of summary judgment on a Title VII discrimination claim, this is what the Ninth Circuit in fact said:

> To proceed to trial, the plaintiff need only raise a genuine dispute of fact as to whether sex was a motivating factor in the challenged decision. *The question whether the evidence supports a single-motive or mixed-motives theory only arises after the parties have presented all of their evidence,* and affects the trial court's jury instructions.

*Dominguez–Curry,* 424 F.3d at 1041 n. 7 (additional emphasis supplied). That is a far cry from allowing a plaintiff to introduce a new legal theory after the fact.

Second, assuming that a mixed-motivation analysis is appropriate in Section 1983 cases, and in this case in particular, *see Gilbrook v. City of Westminster,* 177 F.3d 839, 854–55 (9th Cir.1999), the Court finds that Plaintiffs have not demonstrated by a preponderance of evidence that Charlene's sexual orientation was a motivating factor. As *Gilbrook* noted, the analysis is "an intensely factual o ne, the results of which will vary depending on the circumstances." (*Id.* at 855.) Here, the Court was the fact finder, and had the benefit of assessing the testimony of Wolf and the assistant principals and the supervisors, including their demeanor and credibility, as well as the testimony of the student witnesses. From Plaintiffs' perspective, it would come as no surprise that Wolf denied an improper motive in imposing discipline. (Wolf, ¶ 33.) However, taking into account all of the evidence, the Court believed him.

To be sure there were instances in which the school officials referred to Charlene and Trang as girls. For example, a school discipline form noted "heavy kissing w/other girls." (TX 1.) In his e-mail to another school principal concerning transfer of Charlene, Wolf posed the question: "What do I do with the 2 girls if they keep making out." (Jay, Ex. D; TX 33.) Charlene was referred to a Boys and Girl's Club counseling program with a note stating "persistent public display of relationship w/another girl." (TX 22.) However, they in fact were girls, and in the context

of the school, there was nothing improper about referring to them as such.[15] The Court finds that the sole motivation here was maintaining discipline and a proper school environment.[16] (Wolf, ¶ 50.) [17]

\* \* \* \* \* \* \* \* \* \* \* \*

The Court finds that Wolf is entitled to judgment on the equal protection claim.

## IV. *Violation of First Amendment Rights.*

■ There can be no dispute that the First Amendment protects students when they are on a school campus. *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). There can also be no dispute that a school is a very special forum. As the Ninth Circuit recently observed:

Public schools are places where impressionable young persons spend much of their time while growing up. They do so in order to receive what society hopes will be a fair and full education-an education without which they will almost certainly fail in later life, likely sooner rather than later.

*Harper v. Poway Unified School District,* 445 F.3d 1166, 1175 (9th Cir.2006), *vacated on other grounds,* —— U.S. ——, 127 S.Ct. 1484, 167 L.Ed.2d 225 (2007). In its most recent treatment of students' First Amendment rights, the Supreme Court has confirmed hat those rights must defined "in light of the special characteristics of the school environment." *Morse v. Frederick,* —— U.S. ——, 127 S.Ct. 2618,

2622, 168 L.Ed.2d 290 (2007) (internal quotation marks deleted).

■ A school may regulate speech where school officials can "reasonably ... forecast substantial disruption of or material interference with school activities." *Tinker,* 393 U.S. at 514, 89 S.Ct. 733. But the scope of regulation is not limited to the formulation in *Tinker. Morse,* 127 S.Ct. at 2626–27. "A school need not tolerate *student speech that is inconsistent with its basic educational mission,* even though the government could not censor similar speech outside the school." *Hazelwood School District v. Kuhlmeier,* 484 U.S. 260, 266, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (internal quotation marks and citations deleted; emphasis supplied), *cited with approval in Morse,* 127 S.Ct. at 2627.

With these principles in mind, the Court addresses the conduct in issue here.

### A. *Expressive Conduct.*

The parties agree that the First Amendment also protects "expressive conduct." *Hurley v. Irish–American Gay, Lesbian, and Bisexual Group of Boston,* 515 U.S. 557, 569, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995). The on-campus public displays of affection between Charlene and Trang were intended to express Charlene's gay sexual orientation. The case law recognizes one's right to express his or her sexuality. *Boyd County High School Gay Straight Alliance v. Board of Education,* 258 F.Supp.2d 667, 690 (E.D.Ky.2003); *Henkle v. Gregory,* 150 F.Supp.2d 1067, 1076 (D.Nev.2001); *Fricke v. Lynch,* 491 F.Supp. 381, 385–86 (D.R.I.1980).

---

**15.** Obviously, that was not true in the context of Charlene's home. *See* Section V, *infra.*

**16.** *See* the discussion in the next section regarding the special nature of the school environment.

**17.** "As an administrator, I am not interested in a student's sexual orientation or who they are having a relationship with. I am interested in making sure they get a good education, that they follow the rules like everyone else...." (Wolf, ¶ 50.)

■ But not all conduct with a sexual component is necessarily protected expressive conduct. "Having sex, without more, is not expressive conduct protected by the First Amendment." *832 Corp. v. Gloucester Township,* 404 F.Supp.2d 614, 626 (D.N.J.2005); *Connection Distributing Co. v. Reno,* 154 F.3d 281, 289 n. 8 (6th Cir. 1998); *O'Connor v. City and County of Denver,* 894 F.2d 1210, 1218 (10th Cir. 1990) ("paper boy [not cloaked] with First Amendment protection should he choose to engage in public sex acts while delivering the newspaper"). The conduct here ranged from quick pecks on the cheek or kisses and hugs to French kissing, making out, and groping. The record demonstrates that discipline was imposed only for the later types on conduct.

Two points are significant. First, the school did not prohibit all forms of affection which might display not merely one's affection, but one's sexual orientation as well. Charlene was never disciplined or warned for her morning kiss with Trang as the two went off to their classes, (AM 12–5.) The two were never disciplined or warned for holding hands at lunch, pecks on the cheek, short hugs, or sitting in each other's laps. (*Id.*) With the exception of one occasion where there was a warning, they were never warned or disciplined for having their arms around one another. (*Id.*) Even after the first suspension, Trang understood that permissible conduct still included holding hands, quick kisses, short hugs, and putting arms around one another. (PM 12–5.) Second, the persistence of this conduct for which they were

not disciplined surely expressed their sexual orientation. Thus, it cannot be said that the school sought to eradicate expressions of sexuality, or even expressions of gay sexuality.

The Court is not prepared to hold categorically that French kissing, making out, and groping are forms of conduct which the First Amendment does not protect. They obviously fall short of having sex. However, it should be noted that these forms of conduct are far more explicit than wearing a button, same-sex attendance at prom,[18] dressing in a non-gender conforming manner,[19] or exercising associational rights.[20]

B. *Legitimacy of the Restraints Imposed.*

■ IPDA is inconsistent with the mission of a school, and the Court finds that such conduct may be legitimately regulated by school official consistent with students' First Amendment rights. Assistant Superintendent Gary Lewis testified that IPDA can lead to sexually more explicit conduct, and that such conduct is disruptive, and "sends the wrong message." (PM 12–5.) He also testified that such conduct does not reflect well on the school, and is inconsistent with the focus of a school: to learn. In fact, the complaints which Ms. Gomez in the principal's office received from parents make the very point.[21]

■ Within the framework of *Tinker* and *Hazelwood School District,* the evidence established a legitimate reason to

18. *Fricke v. Lynch,* 491 F.Supp. at 385.

19. *Doe ex rel. Doe v. Yunits,* 2000 WL 33162199 * 5 (Mass.Super.2000).

20. *Boyd County High School Gay Straight Alliance v. Board of Education,* 258 F.Supp.2d at 690.

21. The complaints here are readily distinguishable from the concerns in *Tinker* that the expression of unpopular political views might prove disruptive. *Tinker,* 393 U.S. at 511, 89 S.Ct. 733. Debating the issues of the day is clearly within the mission of a school. Expression of all forms of sexuality is not.

curtail the particular forms of expression which were disciplined in this case. The Federal Constitution does not compel "the teachers, parents, and elected school officials to surrender control of the American public school system to public school students." *Tinker*, 393 U.S. at 526, 89 S.Ct. 733 (Black, J. dissenting).

As the Supreme Court noted in *Hazelwood School District*,

> A school need not tolerate student speech that is inconsistent with its basic educational mission, even though the government could not censor similar speech outside the school. Accordingly, we held in Fraser that a student could be disciplined for having delivered a speech that was sexually explicit but not legally obscene at an official school assembly, because the school was entitled to disassociate itself from the speech in a manner that would demonstrate to others that such vulgarity is wholly inconsistent with the fundamental values of public school education. *We thus recognized that [t]he determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board, rather than with the federal courts.*

*Hazelwood School District*, 484 U.S. at 266–67, 108 S.Ct. 562 (emphasis supplied; internal quotation marks and citations deleted). The Supreme Court's observation concerning deference to school officials in the Fourth Amendment context is relevant here:

> The promulgation of a rule forbidding specified conduct presumably reflects a judgment on the part of school officials that such conduct is destructive of school order or of a proper educational environment. Absent any suggestion that the rule violates some substantive constitutional guarantee, the courts should, as a general matter, defer to

that judgment and refrain from attempting to distinguish between rules that are important to the preservation of order in the schools and rules that are not.

*New Jersey v. T.L.O.*, 469 U.S. 325, 342 n. 9, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). Thus, what may be appropriate on a spring afternoon in a public park or on a public beach, may not be appropriate on the grounds of a public high school, and that was the case here. *Morse*, 127 S.Ct. at 2626–27; *Hazelwood School District*, 484 U.S. at 273, 108 S.Ct. 562. Assuming that French kissing, making out and groping are entitled to consideration as expressive conduct, that conduct was inconsistent with the mission of the school. Regulation of the conduct in issue here did not violate Charlene's First Amendment rights.

C. *Viewpoint Regulation.*

■ The Court finds that the discipline here did not represent impermissible regulation of the viewpoint, namely expression of gay sexuality. To be sure, the record establishes that regulation of IPDA was not entirely uniform, with some instances of IPDA between heterosexual going undisciplined, and some instances of IPDA between Charlene and Trang going undisciplined. However, for the same reasons that the Court finds that there was no violation of Charlene's equal protection rights, the Court finds that discipline for IPDA was viewpoint neutral under First Amendment standards. *Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819, 828, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys"). Indeed, the record established a wide range of conduct expressing sexuality that was neither disciplined nor discouraged, and Charlene acknowledged as much in her trial testimony. (AM 12–1.)

"School principals have a difficult job, and a vitally important one." *Morse*, 127 S.Ct. at 2629. Wolf was not required to tolerate conduct detrimental to the mission of the school. (*Id.*) To the extent that Wolf disciplined Charlene's conduct, that discipline was not meted out based on viewpoint. He did not infringe on Charlene's First Amendment rights.

## V. *Federal Right to Privacy.*

On summary judgment, the Court held that Charlene had a Constitutionally protected privacy right with respect to disclosure of her sexual orientation. (MSJ Order, pp. 13–14, citing *Sterling v. Borough of Minersville*, 232 F.3d 190, 196 (3d Cir. 2000).) Although the Court also found that Wolf was entitled to qualified immunity on the claim (MSJ Order, p. 15), the Court must now determine whether Charlene's rights were violated for purposes of injunctive and declaratory relief. The Court considers the following issues: (1) Did Charlene have a reasonable expectation that her sexual orientation would not be disclosed to her parents; (2) As a factual matter, did Wolf disclose to Charlene's mother that she was gay; and (3) Assuming disclosure was made, did Wolf have a compelling state interest in making the disclosure?

### A. *Reasonable Expectation.*

█ The evidence at trial revealed that at school Charlene and Trang were open in their expressions of affection for one another, although Charlene testified that she limited express disclosure of her gay orientation to five friends. The Court finds that Charlene had no reasonable expectation that her sexual orientation would not be disclosed in the context of her school.

Her conduct at school was inconsistent with any right to keep her sexual orientation private. From this, the School Defendants would conclude that Charlene forfeited her privacy right in all contexts. The Court disagrees. It does not follow that disclosure in one context necessarily relinquishes the privacy right in all contexts. In *U.S. Dep't of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 770, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989), the Supreme Court considered whether disclosure of a rap sheet amounted to an unwarranted invasion of privacy under the Freedom of Information Act, and noted that the fact that "an event is not wholly private does not mean that an individual has no interest in limiting disclosure or dissemination of the information." (*Id.*; internal quotation marks deleted.) Thus, the Court considers the environment of Charlene's home.

The record revealed that Charlene's parents emigrated from Southeast Asia, and spoke a limited amount of English.[22] Her parents rarely went to the high school, and Charlene did not bring Trang home to visit. Outside of school, displays of affection between Charlene and Trang were limited to holding hands at a shopping mall. The Court finds that Charlene's home was an insular environment, and that her activities with Trang at school were unlikely to be known to her parent unless they were expressly informed. Thus, the Court finds that Charlene had a reasonable expectation of privacy concerning her sexual orientation at home.

### B. *Wolf's Disclosure.*

█ The trial record was somewhat confusing as to when Wolf spoke to Chhun

---

22. At trial, Charlene's mother, Chhun, testified through a Cambodian interpreter, although she did answer some of the Court's questions in English. Her dealings with Wolf were in English.

and what he said. There were three occasions.

On the first occasion, in December 2004, Chhun was called to pick up Charlene. Wolf told Chhun that there was a problem, and that she should take Charlene home. Chhun confirmed at trial that Wolf said nothing directly or indirectly to reveal Charlene's sexual orientation.

On the second occasion, Wolf met with Chhun to explain the basis for Charlene's first suspension. For present purposes, it is irrelevant whether this meeting occurred several weeks after the December meeting or in late winter/early spring 2005. Wolf cannot recall what he precisely said to Chhun about the conduct which precipitated the suspension, but he believes that he may have told Chhun that Charlene was kissing a girl. (Wolf, ¶ 22.) In her trial declaration, Chhun does not quote Wolf's words, but states that from the conversation she learned Charlene was gay. (Chhun, ¶ 10.) At trial, the Court asked Chhun to repeat in English the words which Wolf had used to describe Charlene's conduct. She said Wolf told her that "Charlene-she seen with a kissing with a girl." (AM 12–6.) Chhun also testified that Wolf did not use the word "gay" or "lesbian" in the conversation.[23] (*Id.*) The Court finds that Wolf in fact told Chhun that Charlene had been kissing another girl.

Some of the School Defendants testified that there were many reasons other than sexual orientation why two girls might engage in kissing or other romantic displays of affection. (*E.g.,* Lewis, ¶ 10; Baird, ¶ 14; Schwalm, ¶ 19.) And it was ob-

served in closing argument by the School Defendants that certain female performers have engaged in public displays of same-sex affection which go beyond a mere peck on the cheek without any suggestion that they were gay. Yet it remains that one inference which can reasonably be drawn from the statement that Charlene was engaging in same-sex displays of affection is that she was gay, and it was the one Chhun drew: "By being told that Charlene kissing another girl means hat Charlene was gay." (AM 12–6.)

The Court finds that by telling Chhun that Charlene had been kissing another girl, Wolf conveyed Charlene's sexual orientation to her mother. His statement was unvarnished, and it was far more likely that Chhun would infer that Charlene was gay rather than merely acting out or mimicking a rockstar. That is the inference which Chhun drew from the conversation. (Chhun, ¶¶ 9–10; AM 12–6.)

There is a conflict as to whether Chhun really believed that Charlene was gay at that point, and the School Defendants emphasized that there was evidence the Chhun thought Wolf was simply mistaken. However, this misses the point. Whether Chhun believed Wolf or not, the disclosure had been made.

There are suggestions in the evidence that Chhun may have learned of Charlene's sexual orientation from other sources. The Court finds that Charlene's sister, Eileen, was not the initial source, and Chhun so testified. There was evidence that Chhun had a telephone conversation with Trang's father in which he told Chhun that the relationship between Char-

---

**23.** This is consistent with Chhun's trial declaration, which the Court assumes was drafted with precision, and does not use the terms "gay" or "lesbian" or similar language:

> He said that she had repeatedly kissed and hugged in front of other students. I as-

sumed [Charlene] had gotten in trouble for kissing a boy, but then he told me she had been repeatedly kissing a girl. I had not asked him for the name or the gender of the other student.

(Chhun, ¶ 9.)

lene and Trang went beyond mere friendship. Although there is confusion as to when this conversation took place, the Court finds that it was not the source of the disclosure.

Chhun had a third meeting with Wolf near the end of the 2004–05 school year. Chhun asserts that Wolf expressly told her that Charlene was gay. Wolf denied using the word "gay" in that conversation or in any of his dealings with Chhun. The Court need not resolve the conflict because by that point Chhun already knew of Charlene's sexual orientation. At most, Wolf told Chhun something she already knew.

### C. State Interest in Disclosure.

Charlene's right to privacy with regard to her sexual orientation falls under the broader right to informational privacy. As the Ninth Circuit held in *In re Crawford*, 194 F.3d 954, 959 (9th Cir.1999), the right is not absolute:

> The right to informational privacy, however, "is not absolute; rather, it is a conditional right which may be infringed upon a showing of proper governmental interest." Our precedents demand that we *"engage in the delicate task of weighing competing interests"* to determine whether the government may properly disclose private information.

Internal citations deleted; emphasis supplied; *accord Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 551 (9th Cir.2004). In *Crawford*, the issue was the confidentiality of social security numbers which were required in certain bankruptcy filings. The court outlined a series of factors to guide the balancing analysis:

> the type of record requested, the information it does or might contain, the

potential for harm in any subsequent nonconsensual disclosure, the injury from disclosure to the relationship in which the record was generated, the adequacy of safeguards to prevent unauthorized disclosure, the degree of need for access, and *whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access.*

(194 F.3d at 559; emphasis supplied.) As instructed by the Ninth Circuit case law, the Court turns to the weighing process. However, before doing so, it is essential to look at the statutory framework which the California Legislature had adopted.

### 1. The Statutory Framework.

The grounds for suspension are laid out in detail in Section 48900 of the California Education Code.[24] Here the operative portion is subsection (k):

> Disrupted school activities or otherwise willfully defied the valid authority of supervisors, teachers, administrators, school officials, or other school personnel engaged in the performance of their duties.

Cal. Educ.Code § 48900(k). If a principal intends to proceed with a suspension, here is a duty to notify the student's parent or guardian:

> At the time of suspension, a school employee shall make a reasonable effort to contact the pupil's parent or guardian in person or by telephone. Whenever a pupil is suspended from school, the parent or guardian shall be notified in writing of the suspension.

Cal. Educ.Code § 48911(d). But the process goes beyond mere notification. The

---

**24.** Additional and more specific grounds are set forth in the sections which follow. Cal. Educ.Code §§ 48900.2 *et seq.*

statute contemplates interaction with the parent or guardian first:

> The parent or guardian of any pupil shall respond without delay to any request from school officials to attend a conference regarding his or her child's behavior.

Cal. Educ.Code § 48911(f). The conference is part of the due process to which the student is entitled before discipline as serious as suspension is imposed. *Goss v. Lopez,* 419 U.S. 565, 581, 583, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). While the Supreme Court has recognized that an overly elaborate adjudicative process may prove "too costly as a regular disciplinary tool but also destroy its effectiveness as part of the teaching process" (*id.,* at 583, 95 S.Ct. 729), the Court believes that the statute contemplates a meaningful opportunity to discuss and challenge the allegations of misconduct. An informal meeting between the school official and a student or between the official and a student and his parents will comport with due process. *Granowitz,* 105 Cal.App.4th at 355–56 & n. 6, 129 Cal.Rptr.2d 410.

### 2. Balancing the Interests Here.

On the Wolf's side of the scale is his statutory duty which comes into play any time he suspends a student. Under the California Education Code and District policy,[25] Wolf was required to provide Chhun, as a parent of a suspended student, an explanation why discipline was imposed. Cal. Ed.Code, § 48911(d); Schwalm Ex. A; TX 27. The record is clear that his discussion with Chhun in the second meeting was part of his statutory duty to provide Chhun an explanation for the suspension. At a minimum, the Court believes that he was required to disclose the conduct that constituted the sanctioned defiance; namely, IPDA. However, the

statute does not describe what must be disclosed and in what detail.

As noted in the discussion of Charlene's Equal Protection claim, the same-sex displays of affection were not in and of themselves defiant, and Charlene was not disciplined because the conduct was same-sex conduct. This poses the question whether the principal's duty of disclosure extends beyond the elements which make the conduct subject to discipline. If the limits of permissible disclosure were confined to the elements which make the conduct subject to discipline, there would have been no basis for Wolf to disclose Charlene's sexual orientation, albeit by inference.

Because the process contemplates more than mere notification, there is a legitimate reason to provide facts which go beyond an abstract description of the conduct warranting the discipline. If a school administrator is prevented from providing a parent with the context of the discipline, it is difficult to see how the school administrator could have a meaningful discussion of the conduct, or the parent could mount a meaningful protest. For example, a parent may well protest vigorously if he or she believes the alleged conduct out of character for the student.

The School Defendants point to *Granowitz v. Redlands Unified School District,* 105 Cal.App.4th 349, 352–53, 129 Cal. Rptr.2d 410 (2003), as illustrative of facts which need to be disclosed even though the facts may permit an inference of sexual orientation. To be sure, the court of appeal did not address any privacy concerns, but it held sufficient for Constitutional purposes the description of the conduct which the principal revealed. This included "groping or 'diddling' of other boys; and grabbing a girl by the buttocks," where the court defined "diddling" as en-

---

**25.** *See* Section VI.B, *infra,* for a fuller discussion of the District's policy.

gaging same sex-conduct. The facts revealed in *Granowitz* were necessary to communicate the scope and context of the conduct being disciplined, even though they might have invited inferences concerning the disciplined student's sexual orientation.

The Court has held that Charlene had a protected privacy interest in the non-disclosure of her sexual orientation within her home. If Charlene's expressions of her sexuality had not risen to the level of IPDA, clearly Wolf could not have gratuitously told her parents that she was gay or that she was engaging in displays of affection, within appropriate bounds, with another girl. And he did not do that. Wolf made his factually accurate disclosure in the context of discipline. A student would surely appreciate that there would have to be communication between school administrators and parents when discipline rose to the level of a suspension. By virtue of her conduct and the fact that she subjected herself to the disciplinary process, Charlene in effect injected the nature of that conduct into the home.

In balancing Charlene's privacy rights against the rights, on the on hand, and the duties of a principal to make disclosures in the context of suspension and the need to ensure that the student is afforded due process, on the other hand, the Court gives due weight to her rights but nevertheless finds that there is a compelling state inter-est in the disclosure of the objective facts constituting and providing the context for the discipline imposed. By limiting disclosure to objective facts, the Court adopts a workable standard which can be applied without complication.[26]

This case stands in sharp contrast to *Sterling v. Borough of Minersville*, 232 F.3d at 196: This is simply not an instance where the defendants gratuitously and without a governmental purpose disclosed facts which would reflect on the plaintiff's sexual orientation.

Because Wolf had a legitimate governmental purpose in describing the context of the suspension, there was no violation of Charlene's First Amendment privacy rights when he disclosed to Charlene's mother she was kissing another girl.[27]

## VI. *Violation of Right of Privacy under California Law.*

■ Charlene also contends that Wolf's disclosure of her sexual orientation to her mother violated her right under California law. To succeed on a claim for violation of the right to privacy under Article I, Section 1 of the California Constitution, a plaintiff must prove "(1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by the defendant constituting a serious invasion of privacy." *Hill v. National Collegiate Athletic Ass'n*, 7 Cal.4th 1, 39–40, 26 Cal.Rptr.2d 834, 865

---

**26.** Wolf and others testified that they regularly refer to students by gender, and that is what Wolf did here. There was testimony that school officials regularly described the actual conduct which resulted in discipline, including the sex of the participants, and that this would have been consistent with the practice at Santiago and in the District. (Merito Decl. ["Merito"], ¶ 13 (assistant principal, 2001–2004); Stoval, ¶ 9; Smith, ¶ 10; Wolf, ¶ 23.) However, the fact that there was such a practice does not itself create a compelling state interest.

**27.** It would be improper to assume that disclosure of facts which are indicative of sexual mentation will always result in negative consequences. (*See* Plaintiff's Brief re: Federal Constitutional Privacy Rights, pp. 4–5.) The record here establishes that Charlene's mother and sister have been supportive of her. Charlene specifically testified that her parents were supportive once she announced that she was a lesbian. (AM 12–5.)

P.2d 633 (1994). The determination is a mixed question of law and fact:

> Whether a legally recognized privacy interest is present in a given case is a question of law to be decided by the court. Whether plaintiff has a reasonable expectation of privacy in the circumstances and whether defendant's conduct constitutes a serious invasion of privacy are mixed questions of law and fact. If the undisputed material facts show no reasonable expectation of privacy or an insubstantial impact on privacy interest, the question of invasion may be adjudicated as a matter of law.

(*Id.* at 40, 26 Cal.Rptr.2d 834, 865 P.2d 633.)

The Court has previously found that Charlene has a legally protected privacy interest under the California Constitution in information about her sexual orientation. *C.N. v. Wolf,* 410 F.Supp.2d 894, 903 (C.D.Cal.2005). That issue is not contested. Thus three issues remain: (1) Did Charlene have a reasonable expectation that Wolf would not disclose her sexual orientation; (2) did Wolf in fact improperly reveal her sexual orientation; and (3) if so, was his conduct privileged under California law?

### A. *Charlene's Reasonable Expectation.*

For the reasons outlined in the Court's analysis of Charlene's federal privacy rights, she had a reasonable expectation of privacy with regard to her sexual orientation within her home.

### B. *Wolf's Disclosure to Mrs. Ngoun.*

The factual analysis of Wolf's disclosures is no different under the state law. In the second meeting, he revealed facts from which a reasonable person would realize that Chhun would likely infer Charlene's sexuality.

However, the Court finds that in making the disclosure he was carrying out his statutory duty under the Education Code, discussed above in considering the federal privacy claim and below in reviewing his entitlement to statutory immunity. The Court does not believe that Wolf overstepped the boundaries of his duty, and thus did not violate the California constitution. California law, like federal law, recognizes that privacy rights are not absolute. *Hill,* 7 Cal.4th at 37, 40, 26 Cal. Rptr.2d 834, 865 P.2d 633. Wolf was advancing a legitimate state interest with the factually correct and limited disclosure he made to Chhun. *White v. Davis,* 13 Cal.3d 757, 775, 120 Cal.Rptr. 94, 533 P.2d 222 (1975); *Luck v. Southern Pacific Transportation Co.,* 218 Cal.App.3d 1, 20, 267 Cal.Rptr. 618 (1990) ("The constitutional right to privacy does not prohibit all incursion into individual privacy, but provides that any such intervention must be justified by a compelling interest"). There was no violation of Charlene's privacy rights under the California Constitution.

### C. *Applicable California Statutory Immunities.*

 In ruling on the School Defendants' Motion for Summary Judgment, the Court determined that Wolf was entitled to discretionary immunity under Section 820.2 of the California Civil Code for all state claims with the exception of Charlene's privacy claim under the California Constitution and the Unruh Act, Cal. Civil Code § 51.1. Mindful of the record before it, the Court observed:

> However, the Court questions whether Wolf's actions subsequent to the suspensions, including his discussions with C.N.'s mother regarding the suspensions, were discretionary. Defendants have suggested that Wolf was required by the Education Code to explain the reasons for C.N.'s suspension. (*See* Def.'s Motion at 23.) This suggests that those actions were in fact ministerial

rather than discretionary. Therefore, on the present record, the Court finds that discretionary acts immunity is not appropriate as to C.N.'s claim for violation of her state law right to privacy. (MSJ Order, p. 20.) The Court now has before it a full trial record and a better appreciation of the context of Wolf's discussion with Charlene's mother. The Court finds that if Wolf erred in his disclosures, he is nevertheless entitled to discretionary acts immunity.

There is no dispute that Section 48911 of the California Education Code imposes a duty on a principal who has suspended a student to notify the parent or guardian of the school's action. Cal. Ed.Code § 48911(d). Arguably, the act of notification is ministerial. The Education Code also authorizes a district to adopt a policy governing the required communication:

> Each school district is authorized to establish a policy that permits school officials to conduct a meeting with the parent or guardian of a suspended pupil to discuss *the causes, the duration, the school policy involved, and other matters pertinent to the suspension.*

Cal. Ed.Code § 48914; emphasis supplied. Here, the District adopted Administrative Regulation 5151.1 as its suspension policy, which in large measure mirrors the statutory grounds for suspension under Section 48900 of the Education Code. *Compare* Cal. Ed.Code § 48900 *with* TX 27, pp. 2–4. However, as the School Defendants note, the policy is silent on what the principal may convey beyond the fact of suspension. (Defendants' Brief re: Privacy and Compelling State Interest, pp. 3–4.)

The actual practice in the District fills in the gap in the District's regulation. Superintendent Schwalm testified that principals are told to explain the basis for a suspension, but "the amount of information that a principal provides with respect to the facts surrounding the reason are with-

in the discretion of the principal and their communication style." (Schwalm, ¶ 21.) Other senior District administrators had a similar understanding, and that was Wolf's belief. (Baird, ¶ 15; Wolf, ¶ 31.) Such an individualized approach is consonant with Administrative Regulation 5151.1:

> The Board of Education recognizes that each pupil is an individual and that control and correction of pupil misconduct must be handled on an individual case basis.

(TX 27, p. 1.) The existence of an unwritten policy allowing principals discretion in communicating the grounds for a suspension is uncontradicted.

On a full record, the Court finds that the scope of Wolf's communications was not ministerial, but a matter of discretion. This is consistent with Section 48914 of the Education Code which authorizes policies covering suspension communications "including the causes, the duration, the school policy involved, *and other matters pertinent to the suspension.*" Cal. Ed.Code § 48914; emphasis supplied. Determining what is "pertinent" requires the exercise of discretion, and so does the individualization of the discipline process mandated by the District's suspension policy. (TX 27, p. 1.) Assuming Wolf violated Charlene's privacy rights under California law, he is entitled to immunity.

## VII. *Injunctive and Declaratory Relief.*

Because Plaintiffs failed to establish liability under any of their substantive theories, there is no basis for injunctive relief. The School Defendants are entitled to a declaration that they have not violated Charlene's rights under any of the federal or state theories advanced.

## VIII. *Findings of Fact and Conclusions of Law.*

The Court incorporates the foregoing narrative.

### A. Findings of Fact.

1. The School Defendants did not administer discipline for engaging in IPDA in a disparate manner depending on sexual orientation.

2. The School Defendant's disciplining of Charlene was not motivated, either in whole or in part, by her sexual orientation.

3. The School Defendant's had a legitimate governmental interest in administering discipline for IPDA and in the manner such discipline was administered in this case.

4. The policies and practices of the District were sufficiently definite to inform a reasonable student of the meaning of IPDA and the fact that it was prohibited.

5. The School Defendants administered discipline for IPDA in a manner that was viewpoint neutral.

6. Wolf had a legitimate governmental interest in disclosing to Chhun that Charlene had been engaging in IPDA with another girl.

7. Wolf's disclosing to Chhun the basis for Charlene's suspension was a discretionary act.

8. Plaintiffs were not damaged as a result of any wrongful act of the School Defendants.

### B. Conclusions of Law.

1. The Court has jurisdiction over Plaintiffs' federal civil rights claims, 28 U.S.C. §§ 1331, 1343; and the claims for declaratory relief, 28 U.S.C. §§ 2201, 2202; and has supplemental jurisdiction over Plaintiffs' privacy claim under the California Constitution, 28 U.S.C. § 1367(a).

2. The School Defendants did not violate 42 U.S.C. § 1983 by denying Plaintiffs' right to equal protection of the laws in the administration of discipline.

3. The School Defendants did not violate 42 U.S.C. § 1983 by denying Plaintiffs' right to freedom of expression under the First Amendment.

4. The policies and practices of the District were sufficiently definite to inform a reasonable student of the meaning of IPDA.

5. The School Defendants did not violate 42 U.S.C. § 1983 by denying Plaintiffs' privacy rights under the United States Constitution.

6. The School Defendants did not violate Plaintiffs' privacy right under the California Constitution, Article § 1.

7. Assuming that Wolf violated Charlene's privacy rights under the California Constitution, he was entitled to statutory immunity under Section 820.2 of the California Government Code.

8. Because Plaintiffs failed to establish liability under any of their substantive theories, they are not entitled to injunctive relief.

9. The School Defendants are entitled to a declaration that the School Defendants did not violate Charlene's federal or state rights in the administration of discipline in this case, and the Court so declares.

### VI. Conclusion and Afterword.

The Court finds that Charlene has failed to establish that her Constitutional rights under the Equal Protection Clause or under the First Amendment were violated by the School Defendants. The Court finds that Charlene's privacy rights under the California Constitution were not violated, and that in any event, Wolf was entitled to discretionary immunity under Section 820.2 of the California Civil Code. Plaintiffs are entitled to neither compensatory damages nor declaratory or injunctive relief.

While the Court finds that Charlene's rights were not violated, the Court is compelled to make several additional observations. There is no doubt that Charlene's junior and senior years were very difficult times for her, and that dealing with her sexuality and her relationship with Trang took a heavy emotional and psychological toll. The self-imposed scars on Charlene's arm which she revealed at trial were very real; the fact that she considered suicide her senior year was very real. Virtually all teenagers have difficult times as they pass into adulthood. The record makes clear that passage is even more difficult for gay students.

The result here is no license for intolerance. The Court simply finds that the Constitutional and statutory rights which protect Charlene as a gay person were not violated.

Plaintiffs shall take nothing. The School Defendants are directed to submit a form of Judgment consistent with this Memorandum of Decision within seven days.